UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| PHILIP O'HEARN, et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | No. 2:11-cv-337-GZS |
| | ) | |
| NATIONWIDE MUTUAL INSURANCE COMPANY, | ) ) | |
| | ) | |
| Defendant | ) | |

*MEMORANDUM DECISION AND ORDER ON*
*MOTION TO FILE COUNTERCLAIM*

Defendant Nationwide Mutual Insurance Company ("Nationwide") moves pursuant to Federal Rules of Civil Procedure 13(e) and 15(a) for leave to file a counterclaim against plaintiffs Philip O'Hearn and Insurance Solutions of Maine ("ISM"). *See* Defendant Nationwide Mutual Insurance Company's Motion for Leave To File, *Instanter*, a Counterclaim Against Plaintiffs Philip O'Hearn and Insurance Solutions of Maine ("Motion") (Docket No. 20) at 1. For the reasons that follow, the Motion is denied.

**I. Applicable Legal Standards**

Federal Rule of Civil Procedure 13(e) provides that "[t]he court may permit a party to file a supplemental pleading asserting a counterclaim that matured or was acquired by the party after serving an earlier pleading." Fed. R. Civ. P. 13(e). The rule pertains to "counterclaims maturing or accruing after [a] defendant ha[s] answered[,]" as distinguished "from the situation in which a pleading is sought to be amended to add a counterclaim that was in existence at the time the

1

original pleadings were served but was omitted." 6 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1428, at 243 (2010) (footnote omitted).

Pursuant to Federal Rule of Civil Procedure 15(a)(2), "[t]he court should freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend should be granted in the absence of reasons "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. . . . ." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The First Circuit has explained:

> A motion to amend a complaint will be treated differently depending on its timing and the context in which it is filed. . . . As a case progresses, and the issues are joined, the burden on a plaintiff seeking to amend a complaint becomes more exacting. Scheduling orders, for example, typically establish a cut-off date for amendments (as was apparently the case here). Once a scheduling order is in place, the liberal default rule is replaced by the more demanding "good cause" standard of Fed. R. Civ. P. 16(b). This standard focuses on the diligence (or lack thereof) of the moving party more than it does on any prejudice to the party-opponent. Where the motion to amend is filed after the opposing party has timely moved for summary judgment, a plaintiff is required to show "substantial and convincing evidence" to justify a belated attempt to amend a complaint.

*Steir v. Girl Scouts of the USA*, 383 F.3d 7, 11-12 (1st Cir. 2004) (citations, internal quotation marks, and footnotes omitted).

The instant case was filed in the Maine Superior Court on August 4, 2011, and removed to this court on September 6, 2011. *See* Docket Nos. 1 & 1-3. Pursuant to the court's scheduling order, issued on November 21, 2011, the deadline for amending pleadings was February 6, 2012, and the discovery deadline was April 23, 2012. *See* Docket No. 14. Nationwide filed the instant motion on March 23, 2012. *See* Docket No. 20. Because, as of that time, the deadline for

amending pleadings had passed, but no party had as yet moved for summary judgment, the "good cause" standard of Federal Rule of Civil Procedure 16(b) applies.[1]

## II. Factual Background

In their operative amended complaint, filed on February 13, 2012, the plaintiffs allege that Nationwide breached an agent's agreement with O'Hearn (Count I) or, alternatively, a corporate agreement with ISM, a Maine business corporation of which O'Hearn is the sole shareholder (Count II), when, on or about July 1, 2009, it ceased paying O'Hearn deferred compensation known as Agency Security Compensation ("ASC").  *See* Amended Complaint (Docket No. 17) ¶¶ 2, 8-9, 18, 34-41.  O'Hearn asserts that he was entitled to continued payment of ASC in the wake of Nationwide's "qualified cancellation" of his agent's agreement.  *See id*. ¶ 35.

---

[1] The plaintiffs oppose the Motion on grounds, *inter alia*, that Nationwide fails to demonstrate either good cause *or excusable neglect*.  *See* Plaintiffs' Objection to Defendant's Motion for Leave To File, *Instanter*, a Counterclaim Against Plaintiffs ("Objection") (Docket No. 23) at 6-7.  Whereas the good cause standard "focuses on the diligence (or lack thereof) of the moving party more than it does on any prejudice to the party-opponent[,]" *Steir*, 383 F.3d at 11 (footnote omitted), analysis of excusable neglect entails consideration of all relevant circumstances surrounding a party's omission, including "the danger of prejudice to the non-moving party, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith[,]" *Nickerson-Malpher v. Baldacci*, 247 F.R.D. 223, 224 (D. Me. 2008) (citation and internal quotation mark omitted) (considering whether "excusable neglect" shown, for purposes of Federal Rule of Civil Procedure 6(b)(2), when movant failed to respond to a motion to dismiss within the allotted time).  *See also, e.g., Robinson v. Wright,* 460 F. Supp.2d 178, 180-82 (D. Me. 2006) (declining to find excusable neglect in tardy filing of summary judgment opposition resulting from counsel's busyness with other litigation matters despite counsel's apparent good faith, the lack of prejudice to other side, and a relatively short delay; stating, "The Court is not anxious to impose draconian substantive sanctions for procedural defaults; however, absent some colorable basis for finding excusable neglect, the Court is left with neglect alone, an excuse which, as a matter of law, is not enough.").  I apply the more lenient good cause standard here because (i) *Steir* suggests that where, as here, a party files a motion to amend a pleading after the expiration of the court's deadline for doing so, the good cause standard applies, *see Steir*, 383 F.3d at 11-12 & n.4 (motion to amend filed on December 7, 2001, after expiration of November 15, 2000, deadline for amending complaint and November 30, 2001, discovery deadline), and, (ii) in any event, Nationwide, having fallen short of showing good cause, cannot meet the more stringent excusable neglect standard.

On February 27, 2012, Nationwide filed an answer to the amended complaint, asserting, *inter alia*, that the conduct of O'Hearn and of others acting on his behalf and/or on behalf of ISM relieved Nationwide from the obligation to pay ASC and barred the plaintiffs' claim for breach of contract, and that the plaintiffs' claim for ASC was also barred by the doctrine of unclean hands. *See* Affirmative Defenses, commencing on page 7 of Defendant Nationwide Mutual Insurance Company's Answer to Plaintiffs' First Amended Complaint (Docket No. 19), ¶¶ 2, 4, 9.

In its proposed counterclaim, Nationwide alleges, in relevant part, that (i) in 1998, O'Hearn entered into an agent's agreement with Nationwide, *see* Defendant/Counterclaim-Plaintiff Nationwide's [Proposed] Counterclaim ("Proposed Counterclaim") (Docket No. 20-1) ¶ 4, (ii) on or about February 9, 1998, O'Hearn formed O'Hearn Insurance Agency, Inc. ("O'Hearn Agency"), *see id*. ¶ 6, (iii) on or about May 7, 2001, the O'Hearn Agency entered into an agency agreement with Nationwide, which superseded the 1998 agreement between Nationwide and O'Hearn, *see id*. ¶¶ 9-10, (iv) on or about March 31, 2008, O'Hearn formed ISM, *see* ¶ 15, (v) on or about April 29, 2008, ISM entered into an agency agreement with Nationwide, which superseded the 2001 agreement between Nationwide and the O'Hearn Agency, *see id*. ¶¶ 18-19, (vi) O'Hearn personally guaranteed the performance of all terms and conditions of both the O'Hearn Agency's 2001 agreement with Nationwide and ISM's 2008 agreement with Nationwide, *see id*. ¶¶ 11, 20, (vii) the O'Hearn Agency, ISM, and O'Hearn all operated from the same business location, used the same agent number, equipment and facilities, telephone and/or fax numbers, and employed substantially the same employees and/or agents, *see id*. ¶¶ 7, 13-14, 16, 22-25, (viii) on or about October 6, 2008, Nationwide canceled the 2008 agreement when it discovered that O'Hearn was writing insurance on behalf of other insurance

companies without Nationwide's written consent, in violation of the exclusivity clause of the 2008 agreement, *see id*. ¶ 41, (ix) at that time, Nationwide was unaware of any attempts by O'Hearn or ISM to induce Nationwide policyholders to replace their Nationwide policies with policies issued by other companies and, thus, considered the termination a "qualified cancellation," *see id*. ¶ 42, and (x) Nationwide now has information to suggest that O'Hearn obtained appointments with, and sold insurance on behalf of, other insurance companies without Nationwide's approval and provided to others, including Nationwide's competitors, confidential and proprietary information belonging to Nationwide, *see id*. ¶ 43.

Nationwide alleges that, for example, it recently learned that the O'Hearn Agency executed an agency agreement with The Hanover Insurance Group ("The Hanover") effective May 3, 2008, *see id*. ¶ 44, as well as a so-called "roll agreement" with The Hanover in December 2009 pursuant to which the O'Hearn Agency agreed to attempt to convert Nationwide customers to The Hanover and to provide The Hanover with Nationwide's policyholder information and copies of the declarations pages of policies held by Nationwide customers, *see id*. ¶¶ 47-49. Nationwide alleges that, in light of the foregoing evidence, it now appears that its cancellation of the 2008 agreement should have been deemed a "non-qualified cancellation," pursuant to which O'Hearn would not have been entitled to any ASC, *see id*. ¶¶ 53, 133.

Through its proposed eight-count counterclaim, Nationwide seeks (i) a declaratory judgment that the O'Hearn Agency and ISM served as the alter ego of O'Hearn under Maine law (Count I), (ii) damages for the plaintiffs' breach of the exclusivity provisions of the 2001 and 2008 agency agreements by, *inter alia*, selling policies on behalf of companies other than Nationwide and purchasing Dixon Associates, an independent insurance agency, without Nationwide's authorization (Count II), (iii) damages for misappropriation of trade secrets by the

plaintiffs and others acting in concert with them, including the O'Hearn Agency (Count III), (iv) damages for the disclosure of Nationwide's proprietary customer information by the plaintiffs and others acting in concert with them, in breach of the so-called Systems Service Agreement (Count IV), (v) a declaratory judgment that neither O'Hearn nor ISM is entitled to receive ASC (Count V), (vi) recoupment, on a theory of unjust enrichment, of all ASC previously paid by Nationwide to O'Hearn or ISM (Count VI), (vii) a declaratory judgment that Nationwide's cancellation of the 2008 agreement should be deemed a "non-qualified cancellation," as a result of which neither O'Hearn nor ISM was entitled to receive ASC (Count VII), and (viii) a declaratory judgment that Nationwide is entitled to enforce O'Hearn's guarantee of the performance by ISM of all of the terms and conditions contained in the 2008 agreement (Count VIII). *See id.* ¶¶ 81-140.

Nationwide argues that its counterclaim "is based largely upon newly discovered evidence," which it received in response to a subpoena served on The Hanover just 16 days prior to filing the instant Motion. *See* Motion at 1, 5-6.

The subpoena on The Hanover was served on February 21, 2012, with a return date of March 7, 2012. *See* Motion at 11; Exh. 1 (Docket No. 23-1) to Objection. On March 6, 2012, The Hanover mailed certain documents to Nationwide. *See* Exh. 2 (Docket No. 23-2) to Objection.

On March 12, 2012, Nationwide served a response to O'Hearn's first set of interrogatories in which it stated, *inter alia*, that:

1. "[I]ts decision to cancel the Agency Agreement was based upon: 1) discovery, on or about August 15, 2008, that O'Hearn was permitting associate agents . . . to provide customers with quotes from companies other than Nationwide in violation of Nationwide's exclusivity

requirement and brokerage policy; 2) O'Hearn's admission, on or about September 18, 2008, that he had or was attempting to establish an independent insurance agency in the same location as the office of his existing Nationwide agency; 3) O'Hearn's admission, on or about September 25, 2008, that he had permitted his wife, who was an associate agent of Nationwide, to establish and operate an independent agency out of the same location as his Nationwide agency; O'Hearn's admission, on or about September 25, 2008, to having written policies through Peerless Insurance, which was not permitted by Nationwide; and 4) O'Hearn's admission, on or about September 25, 2008, that during July of the same year he purchased Dixon and Associates, an independent insurance agency, which was not approved by Nationwide and was not purchased through Nationwide's Independent Agency Acquisition program, in violation of Nationwide's exclusivity requirement." Defendant's Response to Plaintiff's First Set of Interrogatories ("Interrog. Response"), Exh. 4 (Docket No. 23-4) to Objection, at 2-3.

    2.   "[I]ts decision to cease making ASC payments was based upon evidence that O'Hearn, as principal and owner of Insurance Solutions of Maine, on his own and together with other of his associate agents, w[as] engaging in competition with Nationwide within 1-year following the cancellation of the Agency Agreement and within a 25-mile radius of the location of his Nationwide Agency, that he was directly soliciting Nationwide's customers encouraging them to cancel their Nationwide policies, and Nationwide's belief that he was using its proprietary information, such as customer names, contact information, policy rates and renewal dates to facilitate such activity." *Id*. at 3.

Nationwide notes, for example, that on or about April 3, 2009, it obtained statements from Nationwide customers formerly serviced by O'Hearn that O'Hearn had contacted them directly and urged them to move their insurance business to another company, and, on or about

7

July 13, 2009, it received a complaint from another such Nationwide customer who had been provided a written quote from Traveler's by O'Hearn.  *See id*. at 3-4.

### III. Discussion

The plaintiffs oppose Nationwide's motion on grounds that (i) Nationwide fails to demonstrate either good cause or excusable neglect in support of its bid to file a counterclaim more than six weeks after the expiration of the deadline to amend pleadings and (ii) the counterclaim, in any event, is futile because Counts I, II, IV, V, VII, and VIII are time-barred, Count VI, for unjust enrichment, fails because a contract exists and, in any event, is partly time-barred, and Count III, for misappropriation, fails because the Nationwide policyholder information at issue does not constitute a trade secret.  *See* Objection at 5-15.  The plaintiffs add that Rule 13(e) is inapposite because the eight counts of the counterclaim neither matured nor were acquired after Nationwide filed its answer.  *See id*. at 9-10.  Nationwide filed no reply.  *See generally* ECF Docket.

I agree that Rule 13(e) is inapposite and that, for purposes of Rules 15(a)(2) and 16(b), Nationwide fails to demonstrate good cause for its tardy motion.  On those bases, the Motion is denied.  I need not and do not consider whether the counterclaim, or any part of it, would in any event have been futile.  *See Acosta-Mestre v. Hilton Int'l of P.R., Inc*., 156 F.3d 49, 52 (1st Cir. 1998) (rejecting appellant's argument that "mere delay is not reason enough to deny a motion for leave to amend[,]" which was "contrary to Supreme Court and circuit precedent holding that, especially where allowing the amendment will cause further delay in the proceedings, 'undue delay' in seeking the amendment may be a sufficient basis for denying leave to amend") (citations omitted).

### A. Rule 13(e)

As the plaintiffs argue, *see* Objection at 9-10, Rule 13(e) is inapposite in these circumstances. None of the eight counts of the proposed counterclaim matured or was acquired subsequent to Nationwide's filing, on February 27, 2012, of its answer to the amended complaint.

Nationwide's answers to O'Hearn's interrogatories make clear that it had reason to believe, no later than September 25, 2008, that (i) O'Hearn was blurring the lines of corporate formalities with respect to the O'Hearn Agency and ISM, *compare* Interrog. Response at 2-3 *with* Proposed Counterclaim ¶¶ 81-91 (Count I), and (ii) the plaintiffs had breached the exclusivity provisions of applicable agreements by soliciting business for other insurance companies and purchasing Dixon Associates, *compare* Interrog. Response at 2-3 *with* Proposed Counterclaim ¶¶ 92-96 (Count II).

Nationwide's interrogatory answers also indicate that, no later than July 2009, it had reason to believe that O'Hearn and associated agents or agencies had breached the one-year non-competition agreement pertaining in the wake of the cancellation of the agency agreement by, *inter alia*, directly soliciting Nationwide's customers to encourage them to cancel their Nationwide policies and using Nationwide's proprietary information, such as customer names, contact information, policy rates, and renewal dates to facilitate such activity. *Compare* Interrog. Response at 3 *with* Proposed Counterclaim ¶¶ 97-117 (Counts III-IV).

Counts V, VI, and VII of the Proposed Counterclaim, all of which bear on Nationwide's justification for its cessation of ASC payments to O'Hearn and/or seek recoupment of ASC payments made, hinge on the conduct described in Counts I through IV. *See* Proposed

9

Counterclaim ¶¶ 118-33 (Counts V-VII). Count VIII merely seeks the enforcement of O'Hearn's 2008 guaranty of ISM's obligations. *See id.* ¶¶ 134-40 (Count VIII).

As noted above, in seeking to file its counterclaim, Nationwide relies heavily on the evidence produced by The Hanover in response to Nationwide's subpoena, including the 2008 agency agreement between The Hanover and the O'Hearn Agency and the 2009 agreement to "flip" or "roll" Nationwide-owned business to The Hanover. *See* Motion at 5-9. Nationwide underscores that, through this discovery, it learned that, in order to facilitate the "roll" of the business, O'Hearn and ISM, acting through the O'Hearn Agency, agreed to provide The Hanover with information that Nationwide considers proprietary and highly confidential, to wit, (i) detailed data regarding the loss rates associated with the Nationwide policies that were within the book of business serviced by O'Hearn and ISM and (ii) the declaration pages of policies held by existing Nationwide customers. *See id*. at 5. It asserts: "Although the motive was not clear to Nationwide at the time, it appears that part of O'Hearn's overall plan was to begin selling insurance on behalf of Nationwide's competitors through O'Hearn Insurance Agency, while forming a new corporation, Insurance Solutions of Maine, through which he continued his lucrative relationship with Nationwide." *Id*. at 6.

While this discovery, received after February 27, 2012, helped to buttress Nationwide's claims, those claims did not accrue or mature upon Nationwide's receipt or review of the documents from The Hanover. The harms of which Nationwide complains occurred in 2008 and 2009, and Nationwide admits in its answers to interrogatories that it had reason to believe no later than July 2009 that those very harms were occurring, although it may have not known the precise contours and timing of the suspected misappropriation of its proprietary information. Rule 13(e), hence, cannot serve as a vehicle for the filing of the instant proposed counterclaim.

*See, e.g., Cabrera v. Courtesy Auto, Inc.*, 192 F. Supp.2d 1012, 1015 (D. Neb. 2002) (for purposes of Rule 13(e), "[m]aturity of a claim is synonymous with accrual; that is, the point from which a statute of limitations would run"); *Jordan v. CCH, Inc.*, No. Civ.A. 01-0053, 2002 WL 32348349, at *1 (E.D. Pa. Feb. 5, 2002) (denying bid to file a counterclaim pursuant to Rule 13(e) when defendant's claims for fraud and negligence accrued not upon counsel's review of discovery materials and interview of former customers, but rather when the injury was suffered or the negligent act done).

### B. Rules 15(a)(2), 16(b): Good Cause

As the plaintiffs observe, *see* Objection at 5-6, Nationwide fails to recognize that, the deadline for amending pleadings having passed at the time of the filing of its motion, it bore the burden of showing good cause for its tardy filing, *see* Motion at 9-11. It accordingly makes no argument that it clears that hurdle. *See id.*

Nationwide does argue generally, pursuant to Rule 15(a)(2), that there was no undue delay in filing its motion because no discovery was conducted over the December/January holidays and written discovery did not begin in earnest until the end of January. *See id*. at 10-11. This does not constitute "good cause." Nationwide was, at the least, on inquiry notice of its claims well prior to the filing of the instant suit. No reason appears why it could not have engaged in the discovery on which it now relies sufficiently in advance of the deadline to amend pleadings to have filed a timely motion. *See Steir*, 383 F.3d at 13 ("[T]he inquiry is not limited to a [nonmovant's] conduct: what the [movant] knew or should have known and what she did or should have done are also relevant to the question of whether justice requires leave to amend under the discretionary Rule 15(a) provision.") (citation and internal punctuation omitted).

11

Instead, it served its subpoena on The Hanover on February 21, more than two weeks *after* the expiration of the deadline for amending pleadings.

While a showing of good cause focuses on a movant's diligence, *see, e.g., Steir*, 383 F.3d at 12, and Nationwide has shown none, I also take into account the plaintiffs' persuasive argument that the interposition of this new eight-count counterclaim would prejudice them to the extent that it bears on their conduct prior to October 6, 2008, *see* Objection at 10-11. O'Hearn avers that (i) from 1998 until October 6, 2008, his agency's email and customer database system was provided and maintained by Nationwide, (ii) all or substantially all of his agency's electronic records and communications, including emails, were sent over and stored on Nationwide's system, (iii) his agency's access to that data was cut off on October 6, 2008, and, (iv) at some point thereafter, Nationwide destroyed that data. *See* Declaration of Philip M. O'Hearn in Support of Objection to Defendant's Motion for Leave To File Counterclaim (Docket No. 23-3), Exh. 3 to Objection, ¶¶ 4, 6-7. He plausibly states that his ability to defend against any allegations regarding actions that he, his agency, or its employees took at any time prior to October 6, 2008, would be significantly impaired by the loss of emails and electronic records of the agency's operation, and that the loss of emails would be particularly burdensome because that body of emails constituted the only complete, contemporaneous record of the agency's day-to-day operations and communications in existence. *See id*. ¶ 9.[2]

---

[2] The plaintiffs represent that, during a March 13, 2012, "meet and confer" call to discuss various discovery matters, counsel for Nationwide informed their counsel that, at some point after the termination of the plaintiffs' agency on October 6, 2008, Nationwide purged all of the electronic data at issue, and the "purge" took place in accordance with a Nationwide document retention policy. *See* Objection at 5. They note that they have served discovery on Nationwide to learn about the details of the "purge," the timing of which is not clear. *See id.* Regardless of whether the data was purged in good faith pursuant to Nationwide policies or whether the plaintiffs would have suffered the same prejudice had the Motion been timely filed, the plaintiffs have shown that they will suffer this prejudice if the counterclaim is allowed.

Moreover, allowance of the counterclaim would impact the remaining proceedings, at least to the extent that the plaintiffs could be expected to litigate the issue of the effect of the "purge" on their ability to defend against that counterclaim.

### IV.  Conclusion

For all of the foregoing reasons, the Motion is **DENIED**.

### *NOTICE*

*In accordance with Federal Rule of Civil Procedure 72(a), a party may serve and file an objection to this order within fourteen (14) days after being served with a copy thereof.*

*Failure to file a timely objection shall constitute a waiver of the right to review by the district court and to any further appeal of this order.*

Dated this 6th day of May, 2012.

/s John H. Rich III
John H. Rich III
United States Magistrate Judge